JOHN H. RIDDLE, JR., and SHIRLEY RIDDLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Riddle v. Commissioner
Docket No. 6792-74
United States Tax Court
T.C. Memo 1976-205; 1976 Tax Ct. Memo LEXIS 198; 35 T.C.M. (CCH) 876; T.C.M. (RIA) 760205; June 24, 1976, Filed Sydney R. Rubin, for the petitioners. Louis J. Zeller, Jr., for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax Year
Deficiency
Sec. 6653(b) [1]
1966
$3,691.25
$1,845.63
1967
9,289.52
4,644.76
1968
5,051.29
2,525.65
*199 The principal issue for decision is whether any part of the underpayments in income tax in each of the taxable years 1966, 1967 and 1968 was due to fraud. Respondent concedes that absent a finding of fraud, assessment of additional tax for each of the years in question is barred by the running of the period of limitations on assessment. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Petitioners John H. Riddle, Jr., and Shirley Riddle, husband and wife, resided in Penfield, New York, at the time they filed their petition in this proceeding. Petitioners filed joint Federal income tax returns for the taxable years 1966 and 1967 with the District Director of Internal Revenue, Buffalo, New York, and for the taxable year 1968 with the North Atlantic Service Center, Andover, Massachusetts. Petitioner John H. Riddle, Jr. (hereinafter petitioner) graduated from Syracuse University with a degree in sales management. In order to obtain the degree, petitioner was required to take courses in *200 basic accounting. During the years 1966 through 1968, petitioner operated a printing business which was located in the basement of his home. He also maintained a desk in the living room of his home where he met with customers and suppliers. Petitioner maintained a cash receipts and disbursements journal for his printing business which reflected daily sales and contained columns which were used to record information regarding all checks written on the business checking account, including the names of payees, amounts and the nature of the expenditures. Checks were entered numerically in the journal, and subsequent thereto, each payment was characterized and entered by petitioner in an appropriate column. In 1968, petitioner's wife assisted him by listing the payees of the checks, the amounts, and the check numbers. While the items entered in the journal related primarily to petitioner's printing business, there were also listed checks drawn on the business account which were of a personal nature. Such items were generally recorded in a column labeled "personal." Petitioner maintained his business account and a personal checking account at the Marine Midland Trust Co. of Rochester, *201 New York. During the years 1966, 1967 and 1968, petitioner maintained an account with the brokerage firm of Francis I. duPont & Co. (hereinafter sometimes referred to as the brokerage firm). for the purchase and sale of securities and commodity futures. He established the account in 1965 and first started trading in commodities in 1966. Prior to November 1966, petitioner used only his personal checking account to pay for securities and commodities acquired through the brokerage firm. During 1966, three checks were written on petitioner's personal account in payment of such items. In order to insure that his personal account had sufficient funds to cover the checks, petitioner transferred funds from his business account to his personal account. This was accomplished by issuing checks to himself on the business account and depositing them in his personal checking account. These checks drawn on the business account were recorded in the journal by petitioner as payments to "J. H. Riddle, Jr.," and extended to the "personal" column of the journal. The only other check issued to the brokerage firm during the years 1966 through 1968 from petitioner's personal account was a check *202 in the amount of $2,317.38 dated January 15, 1968, and payable to "F. I. duPont & Co." With the exception of the check dated January 15, 1968, all payments to the brokerage firm after October 1966 were made directly from the business account because most of petitioner's funds were in that account and it was more convenient and expeditious to make the necessary payments directly from such account rather than having to first transfer the funds from the business account to petitioner's personal account. The checks payable to the brokerage firm which were drawn on the business account during the years 1966 through 1968 were as follows: Date
Check No.
Amount
11/21/66
978
$ 3,154.00
11/30/66
995
3,640.00
12/16/66
1016
1,866.00
TOTAL
$ 8,660.00
1/12/67
1068
$ 3,105.00
2/13/67
1093
1,640.00
3/13/67
1142
2,061.00
3/27/67
1168
4,995.00
9/13/67
1301
3,168.00
10/26/67
1382
2,672.58
@TOTAL
$17,641.58
2/7/68
1530
$ 2,132.00
2/13/68
1531
763.04
2/29/68
1581
605.00
5/7/68
40
4,120.00
6/9/68
86
225.00
8/21/68
206
360.00
TOTAL
$ 8,205.04
The payee of each of the above checks was "DuPont & Co." except check No. 86 which *203 was payable to "F. I. DuPont & Co." Each of these checks was recorded in petitioner's journal as a payment to "DuPont & Co." and was extended at a later date by petitioner to the "materials purchased" column of the journal. All of such checks were issued for payments due with respect to petitioner's commodity transactions, except check No. 1531 which was issued in payment of securities in the name of Shirley Riddle. Francis I. duPont & Co. was commonly known in Rochester by the abbreviated designation "DuPont & Co." utilized by petitioner. In a letter to the brokerage firm dated November 29, 1968, petitioner also used such designation. Petitioner maintained a spiral notebook which contained copies of the confirmation statements of petitioner's commodity future transactions. Such notebook, which contained information relating to sales as well as purchases of commodity future contracts, was never shown to petitioner's return preparer or respondent's agents. When a sale of petitioner's commodity future contracts occurred, the proceeds were merely credited to petitioner's margin account, except when the account was closed in late 1968 and the balance of the account was deposited *204 in petitioner's personal checking account. During 1968, petitioner rented an automobile for use in his business. He also purchased an automobile from Paul Ludwig primarily for personal use but which was also used for business purposes. Petitioner recorded such purchase in the journal as a payment to "Paul Ludwig" and entered the amount in the "purchases of equipment" column of the journal. Petitioner also recorded a payment to Fred Shaheen for painting three bedrooms of his home in the "repairs" column of the journal. Petitioner's Federal income tax returns for the taxable years 1966 through 1968 and for at least ten years prior thereto were prepared by Milton Simon, a licensed public accountant. In addition to preparing petitioner's income tax returns each year, Mr. Simon also reconciled petitioner's business bank account. This was accomplished by comparing all of the canceled checks, including those issued to "DuPont & Co.," against the corresponding entries in the journal. Each check to "DuPont & Co." contained on the back thereof the firm's full endorsement -- "Francis I. duPont & Co." The amounts of such checks were substantially larger than most of the other checks *205 listed in the journal. Mr. Simon also prepared detailed workpapers, made adjusting entries relating to petty cash, prepaid interest and depreciation, and reclassfied certain items recorded in the journal. During the years 1966 through 1968, E. I. DuPont de Nemours Co. had a division in Rochester, New York, which sold photo products. Mr. Simon did not know whether petitioner purchased materials or equipment from the company for use in his business. Petitioner did not advise Mr. Simon that the checks to "DuPont & Co.," which were entered in the "materials purchased" column of the journal, were payments for commodity futures and securities. The only items in the journal for which verification was requested were travel and entertainment expenses recorded as "sales expense" and amounts entered as "repairs." If Mr. Simon became uncertain about the proper treatment of such expenses, he would usually telephone petitioner and discuss the item before making an adjustment. He never analyzed or asked for verification of amounts entered in the "materials purchased" column of petitioner's journal. In 1968, an adjustment was made to the amount of materials purchased when petitioner advised *206 Mr. Simon that certain payments for improvements to his living room, totaling $6,185.03, were probably improperly entered in the "materials purchased" column of the journal. Mr. Simon never discussed with petitioner whether or not he was analyzing specific columns in the journal. Nor did he discuss his workpapers with petitioner or review the returns with him in any detail. Petitioner supplied all information requested and never questioned the adjustments and allocations made by Mr. Simon. In order that Schedule D of petitioner's 1966 income tax return could be prepared, the confirmation statements received by petitioner from the brokerage firm relating to the commodities transactions were delivered to Mr. Simon. To expedite the preparation of the return and because of Mr. Simon's lack of familiarity with commodity trading, petitioner was asked to list the commodity transactions on certain forms which were then summarized by Mr. Simon on Schedule D of petitioner's 1966 Federal income tax return. None of the transactions reported on Schedule D involved commodity futures or securities purchased after November 1966 when petitioner began to record payments made to the brokerage *207 firm in the "materials purchased" column of his journal. With the exception of two transactions relating to stock of Nautical Cove, Inc., and General Printing, Inc., petitioner prepared the schedule of gains and losses which was attached to and summarized in Schedule D of petitioner's 1967 income tax return by Mr. Simon. A similar procedure was followed in preparing petitioner's 1968 income tax return. On December 17, 1969, Special Agent Meyer and Revenue Agent Layton interviewed petitioner. At that meeting, petitioner was advised of his rights under the Fifth and Sixth Amendments of the United States Constitution. After receiving these warnings, petitioner answered all of the questions without calling an attorney, delivered all documents which the agents requested, acknowledged that the payments to "DuPont & Co." were for purchases of commodity futures, and fully cooperated in the investigation until he engaged an attorney. The Commissioner, in his statutory notice of deficiency, determined that petitioners understated their taxable income for the taxable years 1966, 1967 and 1968 in the amounts of $12,372.96, $25,326.55 and $19,009.97, respectively. The Commissioner also *208 determined that all or part of the underpayments in income tax for the years 1966 through 1968 were due to fraud. OPINION The principal issue for decision is whether any part of the underpayments in income tax in each of the taxable years 1966, 1967 and 1968 was due to fraud. However, before proceeding to the issue of fraud, we must first decide whether evidence of petitioner's conviction under section 7201, [2] Internal Revenue Code of 1954, pursuant to a plea of nolocontendere, is admissible to impeach the testimony of petitioner's character witness. During the course of the trial, petitioner called Dr. Robert Gering as a witness in his behalf. Dr. Gering testified in part as follows: Q. All right. Based upon your acquaintance with and your dealing with Mr. Riddle and your discussions with others who know him, including those who've done business with him, I'm referring now to the period 1966 through '69, do you know what Mr. Riddle's reputation was in the community and among his associates for honesty and truthfulness during that period? Do you know? A. Yes. Q. And would you state what the reputation for honesty and truthfulness in the community and *209 among his associates during that period was? A. He had an excellent reputation, both for honesty and truthfulness and dependability. Q. And do you know what his reputation is for those traits now? A. As far as I know, there's no change, sir. Q. Have you ever heard anything adverse with regard to his honesty and truthfulness? A. No sir. In order to impeach Dr. Gering's testimony, respondent asked Dr. Gering whether he was aware that petitioner had been convicted of willfully and knowingly attempting to evade income tax for the years 1966, 1967 and 1968 by filing false and fraudulent income tax returns. Petitioner's counsel objected to the admission of petitioner's prior conviction for tax evasion, but agreed to its receipt subject to further consideration by the *210 Court as to its admissibility. Rule 608(b), Federal Rules of Evidence, [3] specifically provides that a witness who testifies as to the character for truthfulness of another witness may, in the discretion of the court, be asked about specific instances of conduct on the part of the person about whom he is testifying. The Congressional intent underlying the rule is to provide a trial judge with discretion in limiting the admission of specific instances of conduct where the prejudicial effect would outweigh the probative value. K. Redden and S. Saltzburg, FederalRules of Evidence Manual 174 (1975). Because we can visualize no danger in admitting the evidence of petitioner's conviction pursuant to a plea of nolocontendere, it will be admitted for the limited purpose of impeaching Dr. Gering's testimony regarding petitioner's reputation for truthfulness. *211 Petitioner's reliance on Rule 410, Federal Rules of Evidence, is misplaced. Rule 410 provides that "a plea of nolocontendere * * * is not admissible against the person who made the plea * * *." The rule prohibits the admission of the plea in the instant case as evidence of fraud, but permits its admissibility for impeachment purposes. Rule 609(a) [4] of the Federal Rules of Evidence describes the types of crimes which may be used to attack the credibility of a witness. A proposed version of the rule specifically excluded convictions resulting from pleas of nolocontendere from use for impeachment purposes; however, this exception was removed prior to the enactment of the rule in its final form. Rule 609 does not apply to the question before us because it deals only with the admission for impeachment purposes of crimes committed by the witness testifying. Accordingly, we hold that the conviction of petitioner on a plea of nolocontendere is admissible for the limited purpose of impeaching the testimony of Dr. Gering. *212 We must now decide whether any part of the underpayments in income tax in each of the taxable years 1966, 1967 and 1968 was due to fraud. Respondent concedes that assessment of additional taxes is barred by section 6501(a) absent a finding of fraud. The issue of fraud is one of fact to be determined upon a consideration of the entire record. William G. Stratton,54 T.C. 255 (1970). The burden of proving fraud under section 6653(b) [5] is placed upon respondent by section 7454. Fraud is never imputed or presumed. It must be affirmatively established by clear and convincing evidence. Anson Beaver,55 T.C. 85 (1970); Rule 142(b), Tax Court Rules of Practice and Procedure. Direct evidence of fraudulent intent is seldom available and whether it exists must be determined from the conduct of the taxpayer and the surrounding circumstances. Fraud must be proved for each year for which respondent seeks to avoid the statute of limitations and impose the addition to tax for fraud, for proof of fraud for one year will not sustain respondent's burden of proving fraud in another year. Thomas J. McLaughlin,29 B.T.A. 247 (1933). *213 The issue of fraud in the instant case primarily turns upon whether the manner in which petitioner recorded payments for commodity future contracts in his cash receipts and disbursements journal was designed to mislead his accountant and result in the understatement of his income tax liabilities. Prior to November 1966, petitioner made payments for commodity future contracts by issuing checks payable to "Francis I. DuPont & Co." on his personal checking account. To insure that there were sufficient funds in his personal checking account to cover the checks written to the brokerage firm, petitioner issued checks to himself on his business checking account and deposited these checks in his personal account. In his cash receipts and disbursements journal, in which were entered all checks written on his business account, petitioner recorded these checks as payments to "J. H. Riddle, Jr." and entered the amounts thereof in the "personal" column of the journal. With one exception, after October 1966 all checks to the brokerage firm were written on petitioner's business account. These checks were payable to "DuPont & Co." Such checks were recorded in the journal as payments to "DuPont *214 & Co." and the amounts thereof were entered in the "materials purchased" column of the journal. During the years 1966, 1967 and 1968, the amount of payments to the brokerage firm which were recorded in the "materials purchased" column of the journal totaled $8,660, $17,641.58 and $8,205.04, respectively. Respondent maintains that the manner in which payments to the brokerage firm were made and recorded in the cash receipts and disbursements journal was designed to overstate the amount of materials purchased and thus understate petitioner's taxable income. Petitioner testified at trial that he began writing checks to the brokerage firm directly from his business account in November 1966 because it was more convenient and expeditious to do so. He also testified that he recorded the payments on the commodity future contracts in the "materials purchased" column of the journal because he "was buying something and it seemed the logical place to put them." Although we do not consider such explanation sufficient in itself to dispel the appearance of fraud which arises from petitioner's manner of recording payments to the brokerage firm, after considering it in conjunction with petitioner's *215 demeanor while on the witness stand and the other facts in the record, we are not convinced that the underpayments in income tax in each year before us were due to fraud. Petitioner's "conduct, in a number of ways, points to an absence of tax fraud." Toledano v. Commissioner,362 F.2d 243, 247 (5th Cir. 1966). First, the information delivered to Mr. Simon for the preparation of petitioners' income tax returns was sufficient to put him on notice as to the nature of the payments to "DuPont & Co." For example, the name of the brokerage firm appeared in bold print on the confirmation statements which were given to Mr. Simon. In addition, all checks written on the business bank account were delivered to Mr. Simon so that the account could be reconciled. This was accomplished by comparing each check against the corresponding entry in the journal. Each check in payment of commodity future contracts contained on the back thereof the full endorsement of the firm -- "Francis I. duPont & Co." In delivering the checks and journal to Mr. Simon, petitioner was aware of the general procedure for reconciling the bank account and of Mr. Simon's knowledge of his trading in commodities. *216 Secondly, on January 15, 1968, petitioner wrote a check to the brokerage firm on his personal account in the amount of $2,317.38. Because the check was written on petitioner's personal account, it did not result in an expense deduction on Schedule C of petitioners' income tax return as did the other payments to the brokerage firm after October 1966. Had petitioner's manner of making and recording payments for most commodity future contracts been designed to mislead his accountant and result in the understatement of his taxable income, it is unlikely that he would have written the check on his personal account. Third, in 1968 an adjustment was made to the amount of materials purchased when petitioner advised Mr. Simon that payments in the amount of $6,956.17 were probably improperly entered in the "materials purchased" column of the journal. Finally, despite the warnings given by Special Agent Meyer at the interview conducted on December 17, 1969, petitioner fully cooperated with the investigating agents until the time he engaged an attorney. See William G. Stratton,54 T.C. 255 (1970). Although a strong suspicion of fraud might arise from the record, "courts *217 will not sustain findings of fraud upon circumstances which at most create only suspicion." Ross Glove Co.,60 T.C. 569, 608 (1973). After a careful review of the testimony and the facts before us, we are left with the impression that the understatements in taxable income for the taxable year 1966, 1967 and 1968 were more likely the result of poor recordkeeping than the willful attempt to evade taxes. Accordingly, we hold that respondent has failed to carry his burden of proving fraud for the years 1966 through 1968 by clear and convincing evidence. Decision will be entered for the petitioner. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. SEC. 7201. ATTEMPT TO EVADE OR DEFEAT TAX. Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.↩
3. Rule 608(b) Specific instances of conduct. Specific instances of the conduct of a witness for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative truthfulness or untruthfulness, be inquired into on crossexamination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. [Emphasis added.] * * ↩
4. Rule 609. IMPEACHMENT BY EVIDENCE OF CONVICTION OF CRIME (a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.↩
5. SEC. 6653(b) FRAUD.-- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.↩